```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
NEIL JOHNSON,

                    Petitioner,
         -against-                                              MEMORANDUM & ORDER
                                                                15-CV-5466 (PKC)
J. COLVIN, Superintendent,

                    Respondent.
----------------------------------------------------------X
```
PAMELA K. CHEN, United States District Judge:

      Petitioner Neil Johnson ("Petitioner" or "Johnson"), appearing *pro se*, petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his first-degree robbery conviction entered on February 11, 2011 in the Supreme Court of the State of New York, Queens County. Petitioner challenges his conviction on the following grounds: (1) his trial counsel was ineffective because he failed to request a jury instruction on an affirmative defense to the first-degree robbery charges and failed to request second-degree robbery as a lesser included offense; (2) his rights to counsel and due process were violated when the police unnecessarily delayed his arraignment in order to interrogate him without counsel; and (3) the verdict was legally insufficient. For the reasons set forth below, the petition is denied in its entirety.

## BACKGROUND

I.  Facts[1]

    **A. Mobil Gas Station Robberies**

On March 5, 2009, at approximately 6:45 p.m., Abdullah Faruque was working alone as a cashier at a Mobil gas station in Queens, when a man "walked in front of [him and] . . .said, you need to hurry up and open up your register" and "give me all the money." (T. 403, 405.)[2] The man was holding an object that "look[ed] like a revolver" with a "silver color[ed] barrel," but Faruque could not see the entire weapon because it "was concealed" by the sleeve of the man's jacket. (T. 403-04.) Faruque gave the man the $400 to $500 in the register, and then the man told Faruque to "give [him] the envelope" of petty cash, which contained another $200. (T. 405-07.) The man left the gas station, and Faruque called 911. (T. 407, 410.) Faruque told the police that he was "looking at the register" during the robbery and did not look at the robber's face because "[he] was really afraid." (T. 407, 417, 431.) However, Faruque went on to describe the robber as a black male, over five feet tall, between twenty-five to thirty years old, and wearing a light blue jacket with a hood. (T. 412.)

On April 13, 2009, at approximately 4:00 p.m., the same individual returned to the Mobil gas station, where Faruque was again working, came to the register, extended his hand, and told Faruque to "give [him] the money." (T. 413-14.) Faruque stated that he again saw "the barrel of the revolver through [the robber's] hand," that it was a "silver color," and that the rest of gun was hidden in the robber's jacket sleeve. (T. 413, 429.) Faruque gave the robber the money in the

---

[1] Because Petitioner was convicted, the Court construes the facts in the light most favorable to Respondent. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[2] "T." refers to the transcript of Petitioner's trial from October 14, 2010 to October 21, 2010. (Dkts. 7-4, 7-5, 7-6, 7-7.)

register, which totaled "below $200." (T. 414.) The man then asked, "where's the envelope?", which Faruque interpreted as the petty cash envelope, and Faruque responded that there was no envelope. (T. 414-15.) A customer walked in while the robbery was in progress, and the robber told Faruque, "don't say anything to the customer. If you say something, I'll shoot you." (T. 417.) The robber then left the gas station, and Faruque and the customer called 911. (T. 420.) Faruque gave the police the same description of the robber as he gave after the first incident. (T. 414, 418.) At trial, Faruque also testified that "when the person on [April 13th] asked [him] for the envelope after [Faruque] initially gave him money, that made [Faruque] believe that it was the same person that came on [March 5th]." (T. 436.)

**B. Shell Gas Station Robberies**

On May 9, 2009, at approximately 7:00 p.m., Adam Amantana was working as a cashier at a Shell gas station in Queens, when

> a gentleman came to the counter with a bag of chips. . . . [W]hen I scanned it I told him the amount of the chips[;]. . . he pull[ed] up his sleeves, jacket sleeves . . . and he showed me a firearm and told me it was a hold up. I should give him all the money that was in the register. I complied. Open up the register. I open up the first register, gave him all the money. So he told me to move to the second register so I moved there. Opened it and I give him the money. And he left.

(T. 252-53, 256.) The robbery lasted "one minute" and the perpetrator stole approximately two thousand dollars. (T. 255, 257.) Amantana stated that he only saw "the nozzle" of the gun because the sleeve of the assailant's jacket was covering the rest of it, but "[i]t was silver and then what was around it was black." (T. 256-57.) As the perpetrator was leaving, he told Amantana "he was going to be back. . . . That was the last thing he told me. He will be back." (T. 258.) Amantana called 911, and described the robber to police officers as approximately five feet five inches tall, two hundred pounds, twenty-five to thirty years old, and wearing a gray jacket with a hood. (T.

255, 261.) The police escorted Amantana to the 113th Precinct to look at photos, but he was unable to identify anyone as the perpetrator. (T. 311, 313.)

On May 14, 2009, at approximately 7:00 p.m., the same man came into the Shell gas station and "came to the counter with the same chips. . . . [H]e pull[ed] the sleeve [of his jacket] and [Amantana] saw the firearm again[,] and then [the man] told [Amantana], I told you I'll be back." (T. 266-67.) Amantana interpreted the man's statement to "mean[] that it's a robbery outright. He showed me the gun and told me he would be back and I'm here again so hurry up." (T. 267.) Amantana gave the man approximately $1,500 in cash and, as the man was leaving, he "told [Amantana] that [this] was not the end." (T. 269.) Amantana's co-worker called 911 and Amantana told police that it was "[t]he same gun" and that "[n]othing changed" between the two robberies except the color of the perpetrator's jacket. (T. 266-67, 315.)

On May 30, 2009, at approximately 7:00 p.m., Amantana was waiting alone at the bus stop across the street from the Shell gas station when, for the third time, the same man "came up with his gun and told [Amantana] to give him [his] personal money." (T. 275.) Initially, "[h]e was just showing [Amantana] the gun. Then he went further to tell [Amantana] this is what you get if you [do] not stay in your country[,] then you come over here to take people's jobs. This is what he told me. So I just gave him all the money that I had in my pocket[,]" totaling $150. (T. 276-77.) Amantana did not call the police after this incident because he had "already called the police twice about this same gentleman." (T. 277-78.)

The fourth and final incident occurred on May 31, 2009 at approximately 1:00 p.m., when the assailant "showed up again" at the Shell gas station, "walk[ed] to the counter," "pull[ed] his sleeve [up] again," and "showed [Amantana] the same gun that he normally shows [him]." (T. 279.) It was "[s]ame individual, this same gentleman." (*Id.*) During the robbery, the perpetrator

4

"told [Amantana] that I told you that will not be the end. I'll still be here. So just give me whatever you have." (*Id.*) Amantana gave him the $300 that was in the register and the man left the gas station. (T. 280.) However, Amantana "saw a [marked] police car held in traffic[,] so [he] ran across the street to tell them what happened." (T. 283, 285.) He told the officers, New York Police City Department ("NYPD") Officer David Cordano and his partner, "that this gentleman over there just robbed a store" and "pointed" to the man who "was still in that vicinity." (T. 285-86.)

The officers "got out of [their] car and started chasing" the suspect, later identified as Petitioner. (T. 286.) Officer Cordano arrested Petitioner five blocks later. (T. 339.) Cordano recovered a cellphone and $271 from Petitioner's pocket. (T. 342.) The money was "all in sequential order. . . . Twenties were with the twenties, tens with the tens, fives with the fives, ones with the ones." (*Id.*) No gun was recovered; however, during the chase, Petitioner "was throwing things out of his pockets when we first started running," but Officer Cordano "couldn't see exactly what." (T. 339.)

**C. Post-Arrest Statements**

After his arrest on May 31, 2009, Petitioner was taken to Queens Central Booking ("QCB"). (H. 101-02.)[3] That same day, NYPD Detective David Shapiro of the Queens Robbery Squad at the 109 Precinct[4], who had been assisting in the investigation of the Mobil and Shell gas station robberies (T. 442-43), received a call from the 113th Precinct's Detective Squad, stating "that an arrest had been made . . . in regards to a similar type robbery that happened in the 113[th]

---

[3] "H." refers to the transcript of Petitioner's *Dunaway/Wade* Hearing on June 29, 2010 and August 11, 2010. (Dkt. 7-2, 7-3.)

[4] The Robbery Squad is a specialty unit that investigates robbery patterns, including "robberies that occur in multiple precincts with the similar type description of perpetrator." (T. 442.)

5

Precinct." (H. 100, T. 446.) However, because it was Shapiro's "regular day off," he and another officer did not retrieve Petitioner from QCB for interrogation until the following day, June 1, 2009, at 10:30 a.m. (T. 446; H. 101-02, 126-27.) After arriving at the 109th Precinct, Petitioner was placed in a holding cell for approximately one hour. (H. 102-03, 126-27.) He was then brought into an interview room and handcuffed, by one hand, to a pole. The interrogation of Petitioner began at 1:00 p.m.—nearly twenty-four hours after his arrest. (H. 102-03, 126-27, 130-31, 144-45.)

> Detective Shapiro explained to Petitioner that
>
> there was a robbery pattern and it was fitting the description of a robbery that [Petitioner] was arrested for the day earlier. As a matter of fact, it was in the same gas station. The same gas station was robbed. I also had the pattern sheet which had all of the robberies on it and I read off some of the robberies to [Petitioner]. I asked if he was familiar with any of those. I wanted to know if he was willing to talk about those. It was a robbery pattern consisting of all commercial robberies, gas stations, the same gas stations hit several times.

(H. 103.) Petitioner stated that "he would talk" and Shapiro read him his *Miranda* rights "from a document, a sheet that has the Miranda warnings written on them, typed on them." (H. 104.) Petitioner then wrote "yes" next to each warning and signed the sheet. (H. 105-06.) At 1:15 p.m., Petitioner gave "some oral statements" that were "transposed to written statements" by 1:45 p.m. (H. 108, 111.) Petitioner wrote and stated that

> he was at these gas stations. He robbed these gas stations with a pen. The pen was used because he didn't want to hurt anybody. He was robbing these gas stations because his daughter was crying for milk. His wife had gone for milk, didn't return. He got angry, left the baby with a neighbor and went to the first location sometime in February, robbed a store with a pen, then moved on to the next gas stations.

(H. 109.) Fifteen minutes later, at approximately 2:00 p.m., Detective Shapiro asked Petitioner if he would look at some surveillance still photos from the March 5, 2009 and May 9, 2009 robberies,

6

which Petitioner agreed to do. (H. 111-12, 133.)[5] Petitioner confirmed orally, and in writing, that he was the person depicted in the surveillance photos. (H. 114, 116 (writing and stating "this is me").)

Petitioner was then taken to participate in two line-ups; the results were negative. (H. 116, 138-39.) Between 7:00 p.m. and 7:45 p.m., Detective Shapiro was advised by another detective on the case that "there [were] more surveillance photos," including some from the April 13, 2009 robbery. (H. 117.) Petitioner agreed to look at the photos and against identified himself. (H. 117, 119, 134.) He then wrote on the photo, "This is me the last time I robbed Mobil at 165 Hillside. This happened in the middle of April. I robbed a short Indian guy. Neil Johnson, 6/01/09, 7:30 p.m." (H. 119.) Shapiro then processed Petitioner's arrests. (H. 120.)

Petitioner was indicted on six counts of Robbery in the First Degree for the Mobile and Shell gas station robberies.

## II. Suppression Hearing

Before trial, Petitioner moved, *inter alia*, to suppress his statements to the police, arguing that his *Miranda* waiver was not knowing and voluntary because of the long delay between his arrest and interrogation and because "[t]here was no re-initiation, nor re-reading or any review of the *Miranda* warnings whatsoever" between the initial interrogation and the line-ups. (H. 180.) Justice Joseph A. Grosso held a *Dunaway/Wade* hearing[6] on June 29, 2010 and August 11, 2010.

---

[5] Using surveillance stills from the March 5, 2009 and May 9, 2009 robberies, Shapiro and his partner had created "wanted" posters stating that they were "looking for a male black, five two to five five, blue jacket. Twenty-five to 30. . . . [G]un involved. The gun was displayed through a sleeve in his jacket." (T. 443-46.)

[6] A *Wade* hearing is a "motion to suppress identification." *Raheem v. Kelly*, 257 F.3d 122, 125 (2d Cir. 2001). A *Dunaway* hearing is "used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial." *Montgomery v. Wood*, 727 F. Supp. 2d 171, 185–86 (W.D.N.Y. 2010)

At the hearing, Officer Cordano described the circumstances leading to Petitioner's arrest. Detective Shapiro then testified, *inter alia*, that Petitioner seemed "normal" and not tired during the interrogation. (H. 137.) He also testified that after Petitioner finished his first written statement, he was given the opportunity to use the bathroom. Shapiro, however, could not recall if Petitioner requested any food. (H. 146-147.) Shapiro also noted that Petitioner "never asked for an attorney" and never requested medical attention. (H. 141, 147-48.) On cross-examination, Shapiro stated that he "didn't inquire" as to whether Petitioner wanted a lawyer present at the line-ups "because I knew he was picked up before he was arraigned." (H. 139.) He testified that he knew that Petitioner's May 31, 2009 arrest had not been docketed at the time that Shapiro picked Petitioner up from QCB, but admitted that he did not speak to court clerk or officers to determine whether Petitioner's case had been docketed. (H. 140-41.)

After the hearing, Justice Grosso denied Petitioner's motion, finding that Petitioner's cases were not formally "docketed at the point in time when Detective Shapiro actually arrived at the [QCB] facility" and that "[t]here was no take-out order involved, so right to counsel would not have been attached because of that." (H. 185, 188.) The Court credited Detective Shapiro's testimony that he "believed that these cases were not docketed" and that "the *Miranda* warnings were given in full, acknowledged[,] and waived." (H. 185-86, 188.) Finally, the Court found that "[t]here was no need whatsoever for Detective Shapiro to re-administer the *Miranda* warnings [between the initial interrogation and the line-ups] since custody was continuous, custody by the same Detective. No need at all. There was no pronounced break in the custodial status at that time." (H. 189.)

8

**III. Trial**

Petitioner's trial was held from October 14, 2010 to October 21, 2010 before Justice Gregory Lasak. Faruque and Amantana, as well as Officer Cordano and Detective Shapiro, testified to the events described above. In addition to the witness testimony, tapes of the 911 calls (T. 261-63, 389-90, 410-11, 421) and gas station surveillance videos (T. 261-63, 271-72, 408-09, 418-19) were introduced into evidence. Petitioner presented no witnesses on his behalf. (T. 513-14.)

On October 21, 2010, the jury found Petitioner guilty of five of the six counts of Robbery in the First Degree. (T. 607-08.)[7] On February 16, 2011, the court sentenced Petitioner, as a second violent felony offender, to three concurrent determinate prison terms of fourteen years to be served consecutively with two concurrent determinate prison terms of thirteen years, for a total of twenty-seven years' imprisonment, followed by five years of post-release supervision. (S. 12.)[8]

**IV. Direct Appeal**

In May 2012, Petitioner appealed his conviction to the New York State Appellate Division, Second Department. In his counseled brief, he argued that his trial counsel was ineffective for not requesting a jury instruction on an affirmative defense to first-degree robbery and not asking the court to submit second-degree robbery as a lesser-included offense. (Dkt. 7, at ECF[9] 1-21.) In a *pro se* supplemental brief, Petitioner also argued that Justice Grosso, who presided over the *Dunaway/Wade* hearing, should have granted his motion to suppress his statements because

---

[7] Petitioner was acquitted of the May 30, 2009 bus stop robbery.

[8] "S." refers to the transcript of Petitioner's Sentencing on February 16, 2011. (Dkt. 7-7.)

[9] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

9

Petitioner's right to counsel was violated when the police failed to honor his request for an attorney and when his arraignment was unnecessarily delayed. He also argued that the evidence regarding four of the first-degree robbery convictions was legally insufficient because no gun was found, no forensic evidence was recovered, and the victims failed to identify him in a line-up. (*Id.* at ECF 50-94.)

On February 19, 2014, the Appellate Division affirmed Petitioner's judgment of conviction. *People v. Johnson*, 114 A.D.3d 877 (2014). The panel found that

> the record amply supports the court's conclusion that the defendant's oral and written statements were admissible, since the hearing testimony established that the defendant was advised of, and voluntarily waived, his *Miranda* rights and did not invoke his right to counsel. Moreover, under the circumstances presented, and since the defendant remained in continuous custody, the police were not required to re-administer the *Miranda* warnings before questioning the defendant again a few hours later.

*Id.* at 877-78. The court also held that the evidence was legally sufficient to "establish the defendant's guilt beyond a reasonable doubt" and that he was "not deprived of the effective assistance of counsel." *Id.* at 878. The Court of Appeals denied Petitioner's leave to appeal on September 24, 2014. *People v. Johnson*, 24 N.Y.3d 961 (2014).

## V. Instant *Habeas* Petition

Petitioner timely filed the instant *habeas* petition on September 21, 2015. (Dkt. 1.) Respondent filed his opposition on February 29, 2016. (Dkts. 6, 7.) On April 25, 2016, the Court stayed this matter so that Petitioner could exhaust his state court remedies (Dkt. 9); specifically, Petitioner requested, under New York's Freedom of Information Law ("FOIL"), a copy of "the June 1, 2009, 11:17 a.m. Interrogation DVD of Queens District Attorney's Pre-Arraignment Interrogation Program" and his QCB booking sheets (Dkts. 12, 13). Petitioner claims that these items are "vital evidence" for any future CPL § 440.10 motion ("440 motion") and that the Queens

10

District Attorney's Office has "flatly . . . refuse[d]" to turn them over. (Dkt. 9, at 1.)[10] It does not appear that Petitioner has filed a motion challenging the alleged denial of his FOIL request. *See McLean v. Brown*, No. 08-CV-5200 (JG), 2010 WL 2609341, at *7 (E.D.N.Y. June 25, 2010) ("If the FOIL request is denied, the prisoner may resort to the agency's appeals body, if any—in this instance, the D.A.'s Office's FOIL Appeals Officer. After exhausting his administrative remedies, the prisoner may challenge the denial in a state-court action for judicial review under Article 78 of the CPLR.").

## STANDARD OF REVIEW

Section 2254 provides that a *habeas corpus* application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks and citation omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" Supreme Court cases, or it "confronts a set of facts that are materially

---

[10] These requests relate to a video statement Petitioner made while at QCB. The prosecution did not introduce the statement at trial and it was not a subject of the suppression hearing. (H. 126.)

11

indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Penry v. Johnson,* 532 U.S. 782, 792 (2001) (citation omitted).

A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (citation omitted). The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams v. Taylor,* 529 U.S. 362, 411 (2000)). Courts must "assess whether the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Garner v. Lee*, No. 17-78-PR, 2018 WL 5985932, at *11 n.14 (2d Cir. Nov. 15, 2018) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir. 2006)).

## DISCUSSION

The Court now lifts the stay in this matter and decides the petition, including both the exhausted and unexhausted claims, on the merits. Pursuant to 28 U.S.C. § 2254, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). "Though neither the Supreme Court nor the Second Circuit has established a standard to guide the exercise

12

of this discretion, many courts in this Circuit have denied unexhausted claims upon a determination that they are patently frivolous." *Warren v. Goord*, No. 06-CV-1423 (RRM), 2013 WL 1310465, at *11 (E.D.N.Y. Mar. 28, 2013); *see also Naranjo v. Filion,* No. 02-CV-5549, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003) (collecting cases); *cf. Rhines v. Weber,* 544 U.S. 269, 270 (2005) ("[T]he district court would abuse its discretion if it granted a stay when the unexhausted claims are plainly meritless."). The Court finds that Petitioner's claims are "plainly meritless" and denies the petition in its entirety.

**I.     Jury Charges**

First, Petitioner argues that his trial counsel was ineffective because he failed to request a jury instruction on an affirmative defense to the first-degree robbery charges and failed to request second-degree robbery as a lesser included offense. Under the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), to establish ineffective assistance of counsel, a *habeas* petitioner must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Carrion v. Smith,* 549 F.3d 583, 588 (2d Cir. 2008) (quoting *United States v. Cohen,* 427 F.3d 164, 167 (2d Cir. 2005)) (internal quotation marks omitted).

With respect to Petitioner's affirmative defense claim—i.e., that his trial counsel should have requested that the jury be instructed that it would be an affirmative defense to robbery if the jury found that Petitioner did not possess a weapon—even assuming *arguendo* that Petitioner could meet the first prong of *Strickland*, Petitioner cannot demonstrate prejudice. Where counsel's alleged error is a failure to advise the defendant of a potential affirmative defense to the crime charged, "the resolution of the 'prejudice' inquiry will depend largely on whether

13

the affirmative defense likely would have succeeded at trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Hibbert v. Poole*, 415 F. Supp. 2d 225, 235 (W.D.N.Y. 2006). Appellant was indicted for first-degree robbery, which requires proof that the defendant "[d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm," during "the course of the commission" of the robbery, or 'in immediate flight therefrom.'" N.Y. Penal Law § 160.15(4). "[I]t is an affirmative defense that [the object displayed] was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged." *Id.* When this affirmative defense is raised, the defendant has the burden of establishing by a preponderance of the evidence "that the object displayed was not a loaded weapon capable of producing death or other serious physical injury." *People v. Gilliard*, 72 N.Y.2d 877, 878 (1988); *see* N.Y. Penal Law § 25.00(2). The court must view the evidence in a light most favorable to the defendant when evaluating whether to submit such an instruction to the jury. *Gillard*, 72 N.Y.2d at 877.

Under the circumstances of this case, it is unlikely that presentation of the affirmative defense identified by Petitioner would have succeeded at trial. The only evidence presented that Petitioner did not have and brandish a firearm during the robberies was his own self-serving statement to Detective Shapiro that "[h]e robbed the[] gas stations with a pen. The pen was used because he didn't want to hurt anybody." (T. 457-58.) By contrast, both Amantana and Faruque testified that they observed the silver "nozzle" and barrel of a gun inside Petitioner's jacket sleeve and believed it to be a real gun. (T. 253, 256-257, 268, 277, 279, 303-305, 316, 403-404, 413, 429.) In fact, Petitioner threatened to shoot Faruque during one of the robberies. (T. 416.) And while neither victim could testify that the object displayed by Petitioner was, in fact, a gun, both testified that it appeared to be a real gun to them. Even viewing the evidence in the light most

favorable to Petitioner, his claim fails. *See Brown v. Walker*, 275 F. Supp. 2d 343, 352 (E.D.N.Y. 2003) ("The gun that witnesses testified to observing [P]etitioner brandish was never recovered. Petitioner's attorney had no ground to argue that the firearm was unloaded or inoperable. It served its purpose of facilitating the robbery by placing the victims in fear. Habeas relief is not warranted on this ground."); *Mitchell v. Scully*, 746 F.2d 951, 954 (2d Cir. 1984) (denying *habeas* relief where "there was exceedingly little likelihood that presentation of the affirmative defense would have succeeded with respect to the first degree robbery charge").[11]

With respect to Petitioner's claim regarding second-degree robbery as a lesser-included offense, this claim is not cognizable on federal *habeas* review. "The Supreme Court has held that due process requires a trial court to submit jury instructions regarding lesser-included offenses in capital cases. The Court, however, has expressly declined to consider whether such a requirement would apply in the non-capital context." *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (citations omitted)(collecting cases). "Given the unsettled nature of federal law in this area, a claim that a trial court erred in failing to instruct the jury on a lesser-included offense in a non-capital case is not cognizable in a *habeas corpus* proceeding." *Conroy v. Racette*, No. 14-CV-5832 (JMA), 2017

---

[11] Additionally, the fact that Petitioner's trial counsel put forth a misidentification defense at trial is an alternate ground on which to deny Petitioner's claim of ineffective assistance with regards to requesting an affirmative defense. As explained by the district court in *Gordon v. Lavalley*: "The decision whether to assert an affirmative defense is a matter of trial strategy that generally will not be second-guessed by a reviewing court. This is especially true when the affirmative defense potentially would undermine the defense offered at trial, *i.e.*, here, the misidentification defense. With respect to the affirmative defense at issue here, the defense of inoperability of the weapon is intended to lessen the degree of criminality, but it necessarily presupposes the commission of the crime. When a defendant claims that he has been misidentified, such a charge does not serve its ameliorative purpose, but, rather, deflects from his protestations of innocence." No. 13-CV-4401 (ALC)(AJP), 2014 WL 888468, at *15 (S.D.N.Y. Mar. 6, 2014) (citations and internal quotation marks omitted; collecting cases), *report and recommendation adopted*, No. 13-CV-4401 (ALC)(AJP), 2016 WL 5793400 (S.D.N.Y. Oct. 3, 2016).

WL 2881137, at *13 (E.D.N.Y. July 6, 2017); *see also Taylor v. Connelly*, 18 F. Supp. 3d 242 (E.D.N.Y. 2014).

Accordingly, the Court denies Petitioner's ineffective assistance of trial counsel claim.

## II. *Miranda* Waiver

Next, Petitioner argues that his rights to counsel and due process were violated when the police unnecessarily delayed his arraignment in order to interrogate him without counsel. As an initial matter, "[t]o the extent that federal habeas courts have even considered the constitutionality of delaying arraignment of state defendants, they have only done so as part of a Fifth Amendment based analysis of the voluntariness of confessions. Thus, delay in arraigning a state defendant is not, in itself, a constitutional violation, but is at most a factor to be weighed in determining whether or not, viewed in the totality of the circumstances, an incriminating statement was the product of police coercion." *Holmes v. Scully*, 706 F. Supp. 195, 202 (E.D.N.Y. 1989) (citing *United States ex rel. Wade v. Jackson*, 256 F.2d 7, 11-12 (2d Cir. 1958)) (collecting cases); *see also Beniquez v. Bennett*, No. 00-CV-0985(JBW), 2003 WL 21508329, at *3 (E.D.N.Y. June 16, 2003) ("[A] reasonable delay in arraignment alone is not a basis for granting the writ [of habeas corpus.]"); *U.S. ex rel. Rosner v. Warden, N. Y. State Penitentiary, Dannemora, N.Y.*, 329 F. Supp. 673, 675 (E.D.N.Y. 1971); *cf. Bartley v. Senkowski*, 144 F. App'x 151, 155 (2d Cir. 2005). Therefore, the Court will only consider whether the delay in Petitioner's arraignment rendered his *Miranda* waiver involuntary.

Petitioner argues that after he was arrested on May 31, 2009, he gave "a statement on video tape to the Assistant District Attorney and Detective, stating he had nothing to do with the robberies." (Dkt. 7, at ECF 60.) He further states that he "advise[d] the A.D.A. and Detective [of] his desire, and of his request to [another] detective . . . to speak with a lawyer" (*id.*), but "at no

16

time . . . was counsel ever provided to [him]," after he repeatedly requested one from the start (*id.* at ECF 62). Even accepting these facts as true and even assuming that his first statement—which was not introduced at trial—was involuntary, that is not sufficient to establish that his subsequent confession the following day was involuntary. Although *Miranda* "requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). A court "cannot rely solely on the *Miranda* presumption that custodial interrogation is coercive in determining whether [a petitioner's] second confession must be suppressed. We must look, once again, to the totality of the circumstances." *Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir. 1998); *see also James v. Walker*, No. 99-CV-6191 (JBW), 2003 WL 22952861, at *3 (E.D.N.Y. Aug. 28, 2003), *aff'd*, 116 F. App'x 295 (2d Cir. 2004).

In assessing the voluntariness of a confession, the court must consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 120 S.Ct. 2326, 2331 (2000). On federal *habeas* review, the state hearing court's findings of fact regarding the circumstances surrounding Petitioner's statements to the police are presumptively correct. *Reyes v. Greiner*, 340 F. Supp.2d 245, 256-57 (E.D.N.Y. 2004), *aff'd*, 150 Fed. App'x 77 (2d Cir. 2005), *cert. denied*, 546 U.S. 1107 (2006). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Petitioner does not challenge any of the testimony or findings made regarding his second confession, including that: it occurred almost twenty-four hours after his first confession; he said he "would talk"; Shapiro read him his *Miranda* rights from "a sheet that has the Miranda warnings

17

written on them, typed on them"; and he wrote "yes" next to each warning and signed the sheet. (H. 104-06.) He also does not challenge Detective Shapiro's testimony that Petitioner seemed "normal" and not tired during the interrogation and, most importantly, that Petitioner "never asked for an attorney." (H. 137, 141, 147-48.) These circumstances could lead a "fairminded jurist" to conclude that Petitioner voluntarily waived his *Miranda* rights and that the second confession "was an act independent of the [earlier] confession." *Reck v. Pate*, 367 U.S. 443, 444 (1961).

### III. Sufficiency of the Evidence

Petitioner argues that the verdict should be vacated because the evidence was insufficient for conviction. The circumstances in which a federal district court may grant *habeas* relief based on insufficiency of the evidence are extremely narrow. As the Supreme Court recently explained: "The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). "[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at 7 (quoting *Jackson*, 443 U.S. at 319). "To have a colorable sufficiency of the evidence claim, [Petitioner] would need to show that the prosecution failed to prove all the elements of the offenses charged." *Alexis v. Griffin*, No. 11-CV-5010 (DLC)(FM), 2014 WL 3545583, at *20 (S.D.N.Y. July 18, 2014), *report and recommendation adopted*, 2014 WL 5324320 (S.D.N.Y. Oct. 20, 2014).

Viewing the evidence in the light most favorable to the prosecution, Petitioner's conviction must stand. To be guilty of Robbery in the First Degree, a person must "forcibly steal[] property and when, in the course of the commission of the crime or of immediate flight therefrom, he or

another participant in the crime: [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm." N.Y. Penal Law § 160.15(4). Not only did Petitioner confess to committing the robberies and identify himself on the surveillance videos of the robberies, but he was actually caught by the police almost immediately after the sixth robbery. And, as discussed above, despite Petitioner's statement that he only brandished "a pen" at his victims, a rational trier of fact could have easily concluded Petitioner displayed "what appear[ed] to be a . . . firearm"—as testified to by both of the victim-gas station employees, Faruque and Amantana—during the robberies.

## IV. AEDPA Deference

Because the Court has rejected all of Petitioner's claims *de novo*, it further finds that the state court's rejection of some of the same claims was not an "unreasonable application of[] clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**CONCLUSION**

For the reasons set forth above, the petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 is denied. Johnson is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Middleton v. Att'ys Gen.,* 396 F.3d 207, 209 (2d Cir. 2005). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: November 29, 2018
       Brooklyn, New York